**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 12 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MADONNA THOMPSON,                                  :
                                                   :
                      Plaintiff,                   :
                                                   :          **MEMORANDUM & ORDER**
            v.                                     :          17-CV-2312 (WFK)
                                                   :
COMMISSIONER OF SOCIAL SECURITY,                   :
                                                   :
                      Defendant.                   :
-----------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Plaintiff Madonna Thompson ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) on behalf of her minor son, CM ("Claimant"), alleging the Acting Commissioner of the Social Security Administration (the "Commissioner" or "Defendant") improperly denied Plaintiff's applications for Children's Supplemental Security Income ("SSI") benefits. Plaintiff moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Defendant also moves for judgment on the pleadings. For the reasons set forth below, Defendant's motion is **DENIED.** The Court hereby **REMANDS** this action to the Social Security Administration for further proceedings, including speech and language testing with a qualified consultative examiner, and full IQ testing utilizing appropriate testing techniques by a qualified consultative examiner, consistent with this opinion.

## BACKGROUND

### I.    Procedural History

On April 30, 2013, Plaintiff filed on behalf of her minor son an application for

Supplemental Security Income benefits pursuant to Title XVI of the Social Security Act ("the

Act"), alleging disability commencing on his date of birth, January 22, 2002 based upon ADHD,

learning disability and astigmatism. (Tr. 144-149)  Plaintiff had filed three prior applications in

2005, 2006, and 2010, all of which were denied at the initial level but not appealed. (Tr. 70)

Plaintiff's application was denied on August 26, 2013. (Tr. 77).  Plaintiff then filed a Request

for Hearing on September 4, 2013. (Tr. 108-109)  On October 8, 2013, Plaintiff filed a letter

requesting that the prior application be reopened. (Tr. 393)  A hearing was held on June 17,

2015 before ALJ Curtis Axelson wherein Plaintiff and her minor son appeared with counsel.

(Tr. 39-62)  In a decision dated July 31, 2015, ALJ Axelson denied Plaintiff's application in a decision that did not address the issue of Plaintiff's request to re-open the prior application. (Tr. 18-38)  In his decision, ALJ Axelson found the claimant did not meet, equal or functionally equal a listing. (Tr. 24)  The ALJ further found he had severe impairments of attention deficit disorder, learning disorder, and slow developing motor skills and non-severe impairment of astigmatism.  Notably, the ALJ never addressed the issue of speech and language delays as either a severe or non-severe impairment.  The Plaintiff filed a timely appeal to the Appeals Council, which denied the request for review, making it the Agency's final decision on February 15, 2017.

Pursuant to 42 U.S.C §§ 405(g) and 1383(c)(3), Plaintiff filed a Complaint in the US District Court for the Eastern District of New York.  Compl., ECF No. 1.  Plaintiff, who filed her complaint *pro se* but is now represented, argues she is entitled to receive SSI benefits on behalf of her son due to his severe medically determinable impairments, including emotional and learning disabilities, and expressive and receptive language delays, all of which render him disabled. (*See generally* Declaration in Opposition to Defendant's Motion to Dismiss ("Pl. Mem."), ECF No. 12)  Before this Court are Plaintiff's Declaration in Opposition to Defendant's Motion for Judgement on the Pleadings, which the Court shall construe as a Cross-Motion for Judgement on the Pleadings and Defendant's Motion for Judgment on the Pleadings ("Def. Mem.", ECF No. 10).

## II.    Claimant's Personal History

Claimant was born on January 22, 2002.  At the time of the hearing, he was thirteen years old and in special education classes in the seventh grade. (Tr. 45.)  Claimant had been placed in Special Education since the third or fourth grade. (Tr. 46)  In 2006, when he was four years old, Mid Island Therapy Associates tested CM and found he had a Full Scale IQ of 60, with a non-

verbal IQ of 62 and a verbal IQ of 62 using the Stanford-Binet Fifth Edition. (Tr. 152-153) On February 19, 2006, Ailene Brownstein, CCC/SLP, performed an evaluation and found CM scored an auditory comprehension of 61, an expressive communication score of 60, and a total language score of 56, using the PLUS-4. (Tr. 155) She noted this placed CM 2.6 standard deviations below the mean. (*Id*.) Based on these evaluations, CM was placed in special education and given an Individualized Education Program. (Tr. 182-194) School records indicate he received speech and language services, occupational therapy, and special one-on-one attention in a reduced classroom.

Plaintiff testified CM has significant problems with reading and writing and sees a therapist two to three times a week. (Tr. 47) Plaintiff stated CM had been receiving speech and occupational therapy noting he indeed has a speech, writing, and learning disability and does not function as a child his age should function. (*Id*.) CM needs help completing even basic tasks. (*Id*.) According to Plaintiff, CM has not been held back in school and has no friends. (Tr. 49) Plaintiff testified that CM does not have a teacher's aide and the school did not want to provide him with such aide even though a neurologist opined he needed one. (Tr. 50) Plaintiff also testified CM was now seeing neurologist Dr. Apzedis upon his pediatrician's referral. (Tr. 51) According to Plaintiff, the neurologist performed an EEG and wanted to prescribe medication. (Tr. 52) Plaintiff testified she wanted CM to receive services rather than simply being medicated. (Tr. 53) She purportedly received a letter from CM's school stating he was at risk of being held back. (Tr. 54) Among CM's difficulties include reading and comprehension, speech, fine motor skills, and completion of standardized tests. (Tr. 56.) His IEP permits him extra time for tests. With respect to social interaction, Plaintiff testified CM has a hard time interacting

with others, noting that he will interact with other children only when he is required to do so. (Tr. 57). Although CM can kick and throw a ball, he cannot properly grasp a fork. (Tr. 57-58).

On the Function Report dated April 30, 2013, which was submitted with claimant's application for benefits, Plaintiff detailed more of the difficulties CM was experiencing. For example, she indicated CM wore glasses, but had no problems hearing. (Tr. 301) According to Plaintiff, CM cannot deliver a telephone message, repeat a story he has heard, tell jokes or riddles correctly, explain why he did something, or talk with friends or family. (Tr. 303) Plaintiff specified CM could not use sentences with "because," "what if" or "should have been." (*Id.*) At the bottom of the questionnaire Plaintiff typed in: "my son has a very bad speech problem" (Id) She stated his ability to progress in learning was limited—he could not, for example, read and understand simple sentences or stories in books or magazines, nor can he print some letters and his name and write in longhand or a simple story with 6-7 sentences. (Tr. 304)_ Consistent with her testimony at the hearing as to his limited social skills, Plaintiff reported CM does not have same age friends, does not make new friends, and does not play team sports. (Tr. 306) With regard to the claimant's ability to cooperate with others and take care of personal needs, she indicated he is unable to choose his clothes, obey safety rules, or accept criticism. (Tr. 307) As for his ability to pay attention, CM cannot finish things he starts, complete homework, or complete chores most of the time. (Tr. 308)

### III.    Claimant's Non-Relevant Medical History

This claim is not one alleging physical impairment, but one based on cognitive limitations, behavioral issues and speech and language impairments. As such, the Court only briefly addresses the medical evidence.

### A.  Maria Soto, M.D.

A letter from ped-med-eye physician Dr. Dichtenstein indicates that CM was found to have visually significant hyperoptic astigmatism and had corrected vision of 20/20 in both eyes. (Tr. 427) Medical records reveal CM received his childhood vaccinations as scheduled and without incident. (Tr. 426) Dr. Soto diagnosed ADHD, learning disability, and partial epilepsy without intractable epilepsy. (Tr. 429) Office treatment records from a visit on December 6, 2012 indicate CM was diagnosed with ADHD and has issues with hyperactivity, daydreaming, aggression towards classmates, and behavioral issues. (Tr. 428) CM was in fifth grade in a CCT program with below average academic performance and was presenting receiving speech and occupational therapy. (*Id.*) She noted CM had received developmental therapies since age three. and was generally in good health. (*Id.*) Treatment records from a visit in November 26, 2012 indicate a well child with normal examination results. (Tr. 432-435) Dr. Soto notes in 2005, CM was hospitalized for pneumonia. (Tr. 432) Office visit records from September 13, 2011 indicate he had speech delays, had received speech and occupational therapy since age two, and was going to a regular education classroom with 2 teachers since age two. (Tr. 436) Dr. Soto notes unremarkable physical examination. (Tr. 437-438) Blood testing showed elevated lipids and allergy to cow milk. (Tr. 439-440) Notes from February 5, 2011 indicate treatment for a respiratory infection. (Tr. 441-442) Notes from an office visit on August 28, 2010 indicate well child with no reaction to immunizations. (Tr. 444-446) It is noted however CM "can be argumentative, enjoys friends, easily embarrassed," and "[c]ognitive/fine motor often idealistic and interested in projects and collections." (*Id.*) Notes from April 5, 2010 show a routine well child visit. (Tr. 448) Treatment records from September 10, 2009 indicate a risk assessment for lead was performed but normal blood levels were indicated. (Tr. 449-452) CM's physical examination was unremarkable. (Tr. 450) On May 29, 2009, CM was seen for a routine well-

child visit. (Tr. 453-454) On February 12, 2009, office visit notes indicate that CM passed both his audiometry and his TB tests. (Tr. 456)

### B. Jose Serruya, MD

A January 25, 2013 letter notes CM was diagnosed with ADHD and learning disability and was placed on amphetamine salt ER. (Tr. 459) On March 12, 2013, Dr. Serruya wrote a prescription for amphetamine salt. (Tr. 475)

### C. St. Vincent's Medical

Notes contain an informational questionnaire provided to St. Vincent's by teacher Judith Owens Small dated September 3, 2009. (Tr. 460-464) Ms. Small reports in hand-written notes CM is "withdrawn and cautious" with other children, behaves cooperatively, is motivated, and is "very impulsive and frustrated." (*Id.*) She also notes he has very poor script, which is "illegible," and he is average in reading. (*Id.*) She noted he was "very motivated cooperative and wants to be part of the class but isolates [himself] because he feels he will be rejected." (Tr. 462) Although cooperative, CM falls short of producing on level work. (*Id.*) Ms. Smalls further noted CM complains of pain in his left ear, from which he cannot hear. (*Id.*)

In a separate portion, Ms. Small checked boxes indicating "very frequently" CM will sit fiddling with small objects, hum and make noises, has poor coordination, is overactive or restless, is excitable, is oversensitive, daydreams, tattles, isolates from other children. (Tr. 463) Ms. Small also reported "quite a bit" CM will fall apart under stress, be inattentive, have difficulty concentrating, act "smart," appear to be unaccepted by the group, appear to be easily led, appear to lack leadership, and be overly anxious to please. (Tr. 463-464) Furthermore, "just a little" CM will be overly serious or sad, selfish, quarrelsome, submissive, fearful, make excessive demands for attention and be stubborn. (*Id.*)

IV.    **Claimant's Psychological and Educational History**

A. **Pre-School Evaluation Summary**

A evaluation summary dated 4/9/06 indicates CM was seen and assessed to have a Full Scale IQ of 60 on the Stanford Binet, Fifth Edition, with A nonverbal IQ of 62 and a verbal IQ of 62, an auditory Comprehension score of 61 on the Preschool Language scale, and an Expressive Communication Score of 60. (Tr. 152-53)

B. **CM's IEP's and School records**

i.    October 2009 Evaluation

i.    May 2006 Individualized Education Plan.

Present performance notes CM currently functions in the deficient range of intelligence as indicated his aforementioned scores. Due to active and impulsive behaviors, CM demonstrated a relative weakness with completing tasks that required following verbal directions. He completed a handful of self-evident, simple tasks that were presented with visual demonstrations. His speech output was limited, and he refused to comply with some verbal expression tasks. (Tr. 184) This IEP also notes CM has a short attention span, is easily distracted, and does not focus for any length of time. (Tr. 185) Moreover, his speech is distorted; he "demonstrates severe receptive and expressive language delays. Standard scores on the PLS-4 were 61 for receptive skills, 60 for expressive skills and an overall score of 56. (Tr. 186)

ii.    October 2009 Evaluation

On October 8, 2009, Aliza Patton, LCSW, examined CW at the request of the New York Department of Education. (Tr. 195-97) Ms. Patton noted CM was in second grade with speech and language therapy and counseling, and described him as "fidgety, having outbursts, having a

low frustration tolerance, and will often isolate himself" though his mother has no complaints of his behavior. (Tr. 195-96)

  iii. 2011 IEP

  The 2011 IEP notes CM had average reading and math scores but below average writing scores. (Tr. 219) In addition, CM exhibited attention problems and rocked back and forth during his evaluation. (Tr. 221) CM's teachers indicated CM had behavioral issues, did not follow directions, and hits or kicks other students. (*Id.*) It is noted he is a "boy with delays in grasping, fine motor, attention and sensory motor, tactile defensiveness [and has] difficulty with handwriting, posture and physical endurance for writing and reading tasks." (Tr. 223) CM was recommended to receive counseling, speech therapy, and occupational therapy and to be tested in an alternate location where he will have time to complete tests with questions read out loud and repeated as often as needed. (*Id.*)

  iv. 2012 IEP

  CM was in third grade and functioning at a second-grade level in writing. (Tr. 203) He demonstrated weakness in attention span as well as motor skills, which limited his ability to write and rendered his handwriting illegible. (*Id.*) It is noted CM has feelings of inadequacy probably due to his speech and language limitations. With regard to skill acquisition, CM is "severely delayed." (*Id.*) Moreover, his "speech/language delays are of concern as they affect his ability to communicate clearly and effectively" and that his "fine motor skills are of concern because they affect his ability to write effectively." (Tr. 203) The IEP recommend CM receive integrated co-teaching services, counseling, speech and language services, and occupational therapy. (Tr. 216)

  v. 2015 IEP

The 2015 IEP notes CM was in the sixth grade and that in the spring of 2014 in a statewide test, he scored a 2.03 in language arts, placing him at the second grade level and a 1.94 in math, placing him just below the second grade level. (Tr. 411)  CM is slower than his pears in daily living, intellectual functioning, and acquiring new skills. (*Id.*)  Moreover, he "struggles with writing as his motor skills are lacking" and "he struggles to keep up with peers" despite having required knowledge. (*Id.*)  It was noted CM would be placed in a classroom with a ratio of 12 students per teacher and is to receive integrated co-teaching services, speech-language therapy, counseling services, and occupational therapy. (Tr. 415-17)

### C. Social Security Administration Consultative Childhood Disability Evaluation

It is of note that no examination was scheduled for CM by the Administration to discern the extent of his speech and language delays, despite his ongoing speech therapy.

i.  David Mahoney, PhD

On July 18, 2013, upon request by the Social Security Administration, psychologist David Mahoney, PhD, examined CM.  Dr. Mahoney noted the claimant was brought to the evaluation by his mother, with whom he lived. (Tr. 466)  He noted CM was eleven and a half years old, was in sixth grade in special education, and was presently receiving speech, occupational and physical therapy. (*Id.*)  Dr. Mahoney opined CM's mother reported he had been diagnosed with ADHD and was prescribed medication, which she could not fill due to her inability to pay.  He noted, however, CM showed no signs of ADHD and was able to sit still, remain seated, and focused on testing materials. (*Id.*)  Moreover, there were no gestational or birth complications or hospitalizations. (*Id.*)  According to Dr. Mahoney, CM's speech and language was age appropriate—he was relaxed and comfortable and able to recall and understand instructions. (Tr. 467)  He stated CM's responses were deliberate, orderly, and self-

correcting; his attention and concentration were good, and he did not show any emotional

distress. (*Id.*) Dr. Mahoney noted CM's non-verbal intelligence test-4 (TONI-4) showed a raw

score of 31, indicating a normal intelligence of 100. (*Id.*) He further opined there was no

limitation in CM's ability to follow directions, complete age appropriate tasks, maintain social

behavior, respond to changes in the environment, learn in accordance to cognitive functioning,

ask for assistance, be aware of danger and interact with peers and adults. (Tr. 467-468) Dr.

Mahoney noted CM had a learning disorder and a "good" prognosis. (Tr. 467) Dr. Mahoney

noted that there were no recommendations. (*Id.*)

    ii.    Jerry Weinberg, MD

On August 6, 2013, upon request by the Social Security Administration, ophthalmologist

Jerry Weinberg, MD, examined CM. Dr. Weinberg found that at the time CM was wearing

hyperoptic astigmatism prescription glasses. (Tr. 469) Dr. Weinberg noted corrected visual

acuity of +1 +2 axis 90 with 20/25 in the right J1 and 20/25 J1 in the left with +150 +225 axis

100. (Tr. 470) He further reported lids and fissures, motility and pupils to be normal and slit

lamp, cornea, anterior chamber and iris were also within normal limits. (*Id.*) There was

intraocular pressure of 11 in each eye. (*Id.*)

### D. Social Security Administration Teacher Questionnaire

    i.    Melissa Scott

On October 29, 2013, CM's sixth grade special education teacher, Melissa Scott

completed a teacher questionnaire evaluation of CM's functioning in school at the request of the

Social Security Administration. (*See* Tr. 395-402) The scope of the evaluation covered the

child's day-to-day functioning in school, including the six domains of "Acquiring and Using

Information," "Attending and Completing Tasks," "Interacting and Relating with Others,"

"Moving about and Manipulating Objects," "Caring for Himself or Herself," and "Medical Conditions and Medications/Health and Physical Well–Being."  At the time of the evaluation, Ms. Scott had known claimant for two months, during which time she saw claimant five times per week for humanities. (Tr. 395.) Ms. Scott noted CM was in the sixth grade and was reading at a third grade level.  (*Id*)  She noted that CM received integrated teaching services, occupational therapy and speech and language services. (*Id.*)

Regarding acquiring and using information, Ms. Scott indicated claimant had problems in that domain, and  proceeded to complete the rating for each activity listed. (Tr. 396.) Ms. Scott indicated CM had a slight problem with understanding and participating in class discussions; an obvious problem with comprehending and understanding oral instructions, with understanding school and content vocabulary, with reading and comprehending written material, with learning new material, applying previously learned material and in applying problem solving skills in class discussions; and a serious problem in providing organized oral explanations and adequate descriptions and in expressing ideas in written form. (*Id.*)   In the remarks section, she hand-wrote "In humanities, CM needs directions repeated several times in order to begin work.  When sharing ideas with the class he struggles to express his thoughts."  (*Id.*)

Ms. Scott did not observe programs with regard to attending and completing tasks, interacting with others, moving about and manipulating objects, and caring for himself. (Tr. 397-400)  She did observe a problem with regard to speech and language.  (Tr. 399)  Ms. Scott noted she did not know CM's medical conditions.  (Tr. 401)

ii.    Erin Bannon

On October 29, 2013, CM's sixth grade special education teacher, Erin Bannon completed a teacher questionnaire evaluation of CM's functioning in school at the request of the

Social Security Administration. (*See* Tr. 403-410) At the time of the evaluation, Ms. Bannon

had known claimant for two months, during which time she saw claimant five times per week for

math. (Tr. 403.) Ms. Bannon noted CM was in the sixth grade, had a math level "below grade 6,"

and received integrated teaching services, occupational therapy and speech and language

services. (*Id.*)

Ms. Bannon indicated CM had problems with acquiring and using information—

specifically: a slight problem with comprehending and understanding oral instructions and with

reading and comprehending written material; an obvious problem with understanding school and

content vocabulary, and with providing organized oral explanations and adequate descriptions;

and a serious problem with comprehending and doing math problems, with understanding and

participating in class discussions, in expressing ideas in written form, in learning new material,

in applying previously learned material and in applying problem solving skills in class

discussions. (*Id.* at 404) In the remarks section, she hand-wrote "CM is very disorganized in

math.  He rarely has a notebook.  His notes are all over the paper (no structure)." (*Id.*)

In the domain of attending and completing tasks, Ms. Bannon noted CM had a serious

problem in completing work accurately without careless mistakes and that he had a very serious

problem with organizing his own things or his school material and in completing assignments.

(Tr. 405)

With regard to interacting and relating to others, Ms. Bannon found CM had a serious

problem playing cooperatively with other children and an obvious problem with making and

keeping friends.  (Tr. 406)  Ms. Bannon indicated that she could not understand more than half of

CM's speech in both known and unknown topics and that even when he repeats and paraphrases,

she cannot understand more than two thirds of CM's speech.  (Tr. 407)  Moreover, Ms. Bannon

observed no problem with moving about or manipulating objects or caring for himself. (Tr. 407-08) Ms. Bannon indicated she did not know CM's medical history. (Tr. 409)

## STANDARD OF REVIEW

When a claimant challenges a denial of disability benefits by the Social Security Administration, the Court's function is not to evaluate *de novo* whether the claimant has a disability but rather to determine "whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also* 42 U.S.C. § 405(g); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (applying "substantial evidence" standard of review). Substantial evidence is "more than a mere scintilla"—it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks and citations omitted). In determining whether the record contains substantial evidence to support a denial of benefits, the reviewing court must examine the entire record, weighing the evidence on both sides to ensure the claim "has been fairly evaluated." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983)).

It is the function of the Social Security Administration—not the federal district court—to "weigh the conflicting evidence in the record" and resolve such conflicts. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see also Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence."). "While the ALJ need not resolve every conflict in the record, 'the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence.'" *Calzada v. Asture*, 753 F. Supp. 2d 250, 268-69 (S.D.N.Y. 2010) (Sullivan, J.) (quoting *Ferraris v. Heckler*, 728 F.2d

13

582, 587 (2d Cir. 1984)). To fulfill this burden, the ALJ must "'adequately explain his reasoning

in making the findings on which his ultimate decision rests'" and must "'address all pertinent

evidence.'" *Kane v. Astrue*, 942 F. Supp. 2d 301,305 (E.D.N.Y. 2013) (Kuntz, J.) (quoting

*Calzada*, 753 F. Supp. 2d at 269).

Ultimately, the issue before the Court is not whether Plaintiff, in argument on appeal, can

articulate an interpretation of the evidence in her favor, but whether a reasonable factfinder could

have weighed the evidence as did the ALJ. *See McIntyre v. Colvin,* 758 F.3d 146, 149 (2d. Cir.

2014 ). "If the evidence is susceptible to more than one rational interpretation, the

Commissioner's conclusion must be upheld." *Id.* But if the ALJ applied an improper legal

standard, or if there are gaps in the administrative record, then remand is warranted. *See Rosa v.

Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

After reviewing the Commissioner's determination, a district court may "enter, upon the

pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

*Butts,* 388 F.3d at 384 (quoting 42 U.S.C. § 405(g)). "Remand is particularly appropriate where

further findings or explanation will clarify the rationale for the ALJ's decision." *Grace v. Astrue*,

No. 11–cv–9162, 2013 WL 4010271, at \*14 (S.D.N.Y. July 31, 2013) (citing *Pratts v. Chater*,

94 F.3d 34, 39 (2d Cir.1996)).

## DISCUSSION

### I.    Determination of Disability

#### A. Applicable law

An individual under the age of eighteen is considered disabled under the Act if she has "a

medically determinable physical or mental impairment, which results in marked and severe

14

functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *Kittles ex rel. Lawton v. Barnhart,* 245 F.Supp.2d 479, 487 (E.D.N.Y.2003). Further, although not in dispute in this case, an individual under the age of eighteen who "engages in substantial gainful activity" is not eligible for SSI benefits. 42 U.S.C. § 1382c(a) (3)(C)(ii).

In order for a claimant under the age of eighteen to be found disabled, the Act requires an ALJ to conduct a three-step sequential analysis finding each of the following: (1) that the claimant is not engaged in substantial gainful activity; (2) that the claimant has a medically determinable impairment or a combination of impairments that is "severe" (i.e., the impairment or combination of impairments cause more than a minimal functional limitation); and (3) that the impairment or combination of impairments meets or equals a disabling condition identified in the listing of impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (a "listed impairment"). *See Jones ex rel. T.J. v. Astrue*, No. 07–CV–4886, 2010 WL 1049283, at *5 (E.D.N.Y. Mar. 17, 2010); *Kittles*, 245 F.Supp.2d at 488; 20 C.F.R. § 416.924(b)-(d). Equivalence to a listed impairment may be medical or functional. *See Jones ex rel. T.J.*, 2010 WL 1049283, at *5; *Kittles*, 245 F.Supp.2d at 488; 20 C.F.R. § 416.924(d).

Analysis of functional equivalence requires the ALJ to assess the claimant's functional ability in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1). The six domains- (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for oneself, (vi) health and physical well-being-are "broad areas of functioning intended to capture all of what a child can or cannot do." *Id.* Functional equivalence is established when the ALJ finds the

claimant has a "marked limitation" in two domains or an "extreme limitation" in one domain. 20 C.F.R. § 416.926a(a).

A "marked limitation" is one that "seriously interferes" with a claimant's ability to initiate, sustain, and complete activities. 20 C.F.R. § 416.926a(e)(2). It is "more than moderate, but less than extreme." *Id.* In addition, the regulations further describe a "marked limitation" as what would be expected with the equivalent of two standard deviations below the mean on standardized testing. 20 C.F.R. § 416.926a(e)(2)(iii). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." *Jones*, 2010 WL 1049283, at *6 (quoting 20 C.F.R. Pt. 404, Subpart P, App. 1, § 112.00(C)). An "extreme limitation" is one that "very seriously interferes" with a claimant's ability to independently initiate, sustain, and complete activities. 20 C.F.R. § 416.926a(e)(3). It is designated for the "worst limitations . . . but does not necessarily mean a total lack or loss of ability to function." *Id.* The regulations describe an "extreme limitation" as what would be expected with the equivalent of three standard deviations below the mean on standardized testing. 20 C.F.R. § 416.926a(e)(3) (i), (iii).

### B. ALJ's Decision

At the hearing, plaintiff appeared with counsel and testified on behalf of claimant. (Tr. 45-58) The ALJ also heard limited testimony from claimant. (Tr. 60-61.)

On July 31, 2015, the ALJ issued a decision in which he concluded CM was not disabled within the definition of the Act. (Tr. 18-38 (citing 20 C.F.R. § 416.924(a)).) Performing the three-step evaluation process for determining whether an individual under the age of 18 is

16

disabled, 20 C.F.R. § 416.924, discussed further below, the ALJ first found CM had not engaged in substantial gainful activity since the date of his application. (Tr. 24)  Second, the ALJ found CM suffered from the following severe impairments:  ADHD, learning disorder and slow developing motor skills. (Tr. 24)  The ALJ also found CM had the non-severe impairment of astigmatism.  (*Id.*) At the third step, however, the ALJ determined the impairments did not meet, medically equal, or functionally equal the severity of one of the listed impairments set forth in Appendix I to Subpart P of Part 404 of the Regulations. (*Id.*)

In determining CM's impairments did not functionally equal any listed impairment, the ALJ considered Childhood Listings 112.11 and 112.02 but found a lack of marked impairment in cognitive/communication functioning, a lack of a marked impairment in social functioning, a lack of a marked impairment in personal functioning or a marked impairment in difficulty in maintaining concentration, persistence and pace.  (*Id.*)  The ALJ then evaluated CM's degree of limitation in the six domains set forth in 20 C.F.R. § 416.926a(b) after considering all of the relevant evidence in the case record. (*Id.*)  After considering claimant's symptoms, the ALJ determined that claimant and plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the ALJ's finding that claimant's impairments did not functionally equal a listing. (Tr. 25)

The ALJ found that CM had a less than marked limitation in the domain of acquiring and using information. (Tr. 29)  He did not indicate any exhibit to support this finding and briefly noted "The claimant has a learning disorder and a speech and language delay.  He is in an integrated co-teaching class with special education services in class.  He has reported difficulties in reading, writing and math.  However, he obtained an average IQ score at the consultative

examination. The claimant's teachers both opined that he had the equivalent of less than a marked limitation in this area." (*Id.*)

In the domain of attending and completing tasks, the ALJ found less than marked limitation. (Tr. 30.) He noted CM had been diagnosed with ADHD by his pediatrician but noted that the psychologist found no sign of ADHD. Moreover, he noted CM's IEP states he needs adult assistance in completing assignments and has difficulty with organization; his teacher Ms. Bannon opined there were less than marked limitations; and Ms. Scott opined there were no limitations. (*Id.*)

The ALJ found a less than marked limitation in the domain of interacting and relating with others. (Tr. 30-31) He stated although Plaintiff testified CM has no friends, his IEP indicates he enjoys being around peers, and notes "he has good relationships with teachers and peers however; he has difficulty building strong bonds with friends and sometimes says hurtful things without meaning to" (*Id.*) Moreover, Ms. Bannon had opined there were less than marked limitations, while Ms. Scott opined there were no limitations. (*Id.*)

In finding less than a marked limitation in the domain of moving about and manipulating objects, the ALJ stated although Plaintiff indicated he could not hold a fork properly and recieves occupational therapy due to difficulty with fine motor skills, both teachers indicated there were no limitations in this domain. (Tr. 31-32)

In the domain of caring for yourself, the ALJ found no indication from CM's teachers the claimant has any difficulties and that Plaintiff had not alleged any. (Tr. 32-33)

Finally, the ALJ found no limitation in the area of health and physical well-being, stating the only physical condition alleged was astigmatism, which is non-severe. (Tr. 33-34)

**II.   Analysis**

18

## A. Failure to Adequately Develop the Record

The decision is notable insofar as the ALJ has failed to consider CM's speech and language difficulty as either a severe or non-severe impairment. It is equally notable that despite the fact CM has received speech and language services at school, and Ms. Bannon stated that she could only discern half of what was spoken by CM, there is no indication from the record a questionnaire was sent to CM's speech and language teacher at school, nor is there any indication the Administration attempted to obtain any report from a consultative examiner to discern the extent of CM's speech and language delays.

The ALJ makes three passing references in the decision to the fact CM had speech and language delays but failed to consider them. The fact that the school records indicate CM received speech therapy for a period of five years on a weekly basis would indicate there is likely more than a de minimis effect. Additionally, Ms. Bannon opined at the time CM was in sixth grade, his speech remained largely unintelligible.

We note ALJs bear an affirmative duty to develop a claimant's medical history for the 12 months prior to the date that the claimant filed for disability, should the evidence presented be insufficient to determine whether the claimant is disabled. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 2011); *Hilsdorf v. Commr of Soc. Sec.*, 724 F. Supp. 2d 330, 343 (E.D.N.Y. 2010). At bottom, the ALJ must make "*every* reasonable effort" to obtain reports from medical sources to fill gaps in the administrative record. 20 C.F.R. § 416.912.

The fact that the claimant was noted to have a speech and language delay that was a of such severity as to require speech therapy on a weekly basis raised, at the very least, the question as to whether the claimant suffered from a severe impairment. While it is noted the consultative psychologist, Dr. Mahoney, opined the claimant had age appropriate language, that statement is

19

clearly inconsistent with the school records as a whole and with Ms. Bannon's statement. Moreover, while the record shows Dr. Mahoney is trained in psychology there is no indication he has any expertise of any kind in speech therapy.

Pursuant to SSR 09-1p, the ALJ is required to consider an impairment with regard to its effects on each of the domains. A limitation in speech and language will commonly affect a child in both the domain of acquiring and utilizing information, as well as the domain of interacting with others. Because CM's difficulty with speech and language potentially impacts two separate domains, it is of significance that the ALJ failed to develop the record with regard to that impairment.

Accordingly, we remand with the direction that the claimant be evaluated by a qualified expert with regard to his speech and language delays.

### B. Failure to Consider the Record Adequately

The ALJ may not "pick and choose" from the transcript only such evidence that supports his decision. *Sutherland,* 322 F.Supp.2d at 289. In his decision, the ALJ merely cited several exhibits supporting his determination with little to no explanation of their content. With regard to the domain of acquiring and using information, the ALJ failed to properly consider the evidence.

The domain of "acquiring and using information" for six-to-twelve year-old children analyzes the child's ability to learn to read, write, do math, and discuss history and science, as well as the ability to demonstrate what he has learned in both academic and daily living situations. 20 C.F.R. § 416.926a(g)(2)(iv). The child should be able to "use increasingly complex language . . . to share information and ideas with individuals or groups, by asking questions and expressing [his] own ideas, and by understanding and responding to the opinions

of others." *Id Thompson v. Barnhart*, No. 02 CV 4930 (SJ), 2004 WL 896663, at *3 (E.D.N.Y. Mar. 26, 2004).

In the domain of acquiring and using information, the ALJ noted that his finding of a less than marked limitation was supported by the fact that that he received an average IQ score at the consultative examination and that the teachers both opined that [CM] had the equivalent of less than a marked impairment. (Tr. 29) The ALJ errs in both statements.

First, it is notable that the consultative examiner did not administer a full battery of IQ testing to the claimant. The consultative examiner administered a TONI-4 test, which is a test for non-verbal IQ. The standard testing for IQ in children is performed by the use of the Stanford-Binet, Fifth Edition or more frequently by the Wechsler Intelligence Scale for Children-Revised (WISC-R) It appears to be the belief of most experts in the field that subjects scored significantly higher on the TONI-4 than on the WISC-R, measuring full scale IQ.[1] Moreover, the fact that the consultative examiner utilized a non-verbal IQ test to determine the intelligence of a child known to have speech and language delays raises questions. By administering a test which inherently accommodates and corrects CM's greatest weakness (reading and language) the test essentially stacks the deck in favor of finding a less severe limitation than would be found using traditional tests. Additionally, a finding of an average IQ is in stark contrast to school records dating from the time that claimant was in Kindergarten.

The ALJ's statement that the teachers Scott and Bannon found CM to have less than marked limitations is equally unfounded. Both teachers noted that CM had multiple "serious problems" in the realm of acquiring and using information. (Tr. 396, 405) The IEP records and the questionnaires indicate CM was performing at the third grade level in reading and below

---

[1] The Relationship among the Test of Nonverbal Intelligence, Ammons' Quick Test, and Wechsler Intelligence Scale for Children-Revised Booney Vance, Norman Hankins, Wesley Brown, First Published October 1, 1986.

grade level in math. (Tr. 395, 403) Additionally, his IEP from the sixth grade indicateson statewide standardized tests, CM tested at the second grade level in both language and math. (Tr 411) On its face, it is clear that a child who is two standard deviations below the norm would meet the criteria to be found to have a "marked impairment" pursuant to 20 C.F.R. § 416.926a(e)(2). But in this case, and under the specific circumstances, it is arguable that CM would be found to have an "extreme impairment, pursuant to 20 C.F.R. § 416.926a(e)(3).

In assessing whether a child has marked or extreme limitation, an ALJ is required to consider the amount of assistance which a child is receiving. 20 CFR Section 416.926a Functional equivalence for children states: "when we assess your functional limitations, we will consider the relevant factors in Sections 9416.924a, 416.924b and 416.929 including but not limited to (1) how well you can initial and sustain activities, how much extra help you need and the effects of structures and supported settings (see Section 416.924a(b)5)." The Courts of this circuit have routinely found that "special classrooms" fall under the definition of a "supported setting." See *Thompson*, 2004 WL 896663, at *3.

Here, we have clear evidence CM was three grade levels behind in language despite the fact that CM was enrolled in special education and receiving services. Accordingly, the ALJ should have considered whether CM's limitations rose to the level of an extreme limitation.

Given the fact that we remand this case back for further development and proceedings, we do so with the additional direction that CM be sent for a full battery of IQ testing, utilizing not only non-verbal intelligence testing, but also traditional IQ testing pursuant to the Stanford-Binet, Fifth Edition or the Wechsler Intelligence Scale for Children-Revised (WISC-R). Because we have remanded the case back for further development we will not address the remaining domains and the ALJ's findings as to disability in those domains.

### C. Substantial Evidence

As noted above, the Commissioner argues only that her decision is supported by substantial evidence and therefore should be upheld. (*See generally* Def. Mem.) Consideration of whether the Commissioner's disability determination is supported by substantial evidence is improper where remand is warranted due to the ALJ's failure to consider certain evidence or apply the law properly in assessing the evidence. *See, e.g., Lebron v. Colvin,* No. 13–CV–9140, 2015 WL 1223868, at *23 (S.D.N.Y. Mar.16, 2015). The court has determined that the ALJ failed to properly develop the record and failed to properly consider the evidence before him. Accordingly, the court does not reach the issue of whether the ALJ's decision was supported by substantial evidence here.

### **CONCLUSION**

For the reasons set forth above, the court denies the defendant's motion for judgment on the pleadings, denies in part plaintiff's motion to the extent it seeks remand solely for the calculation of benefits, and grants plaintiff's motion to remand this case for further proceedings consistent with this opinion. On remand, the ALJ shall:

(1) Develop the record with regard to the claimant's impairments of speech and language delays, and schedule a consultative examination with a qualified speech therapist;

(2) Develop the record with regard to the claimant's learning disorder and schedule a consultative examination with a full battery of IQ tests performed on traditional examination  pursuant to either the Stanford-Binet, Fifth Edition or the Wechsler Intelligence Scale for Children-Revised (WISC-R).

The Clerk of the Court is respectfully requested to close this case.

**SO ORDERED.**

s/WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: September 10, 2019
      Brooklyn, New York